UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PEDRO ROMERO,

                                 Petitioner,

    v.                                                  9:18-CV-381
                                                         (GLS/ATB)

CHRISTOPHER MILLER, Superintendent

                                 Respondent.

PEDRO ROMERO, Petitioner, pro se
MARGARET A. CIEPRISZ, AAG for Respondent
DENNIS A. RAMBAUD, AAG, for the Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Gary L. Sharpe, Senior United States District Judge.

     Presently before this court is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Petition ("Pet.")) (Dkt. No. 1). Petitioner challenges a judgment of conviction, dated June 27, 2014, rendered after a jury found him guilty of Second Degree Murder; Attempted Second Degree Murder; First Degree Assault; and two counts of Second Degree Criminal Possession of a Weapon. (Pet. at ¶ 5). Petitioner was sentenced to an indeterminate term of 25 years to life incarceration, consecutive determinate terms of 25 years for the attempted murder and first degree assault convictions which were to be served concurrent to each other. Petitioner was sentenced to a determinate term of 15 years for each of the weapons counts which were to be served concurrent to all the other counts. The judge also imposed a five year period of

post-release supervision to follow each of the determinate prison terms . (Sentencing Transcript ("ST") at 9-10).[1] On February 10, 2017, the Appellate Division, Fourth Department reduced the first degree assault conviction to second degree assault, and remanded for resentencing on that count, but affirmed petitioner's conviction in all other respects.[2] *People v. Romero*, 147 A.D.3d 1490, 1491-92 (4th Dep't 2017), *amended on reargument*, 148 A.D.3d 1726 (4th Dep't 2017). The New York Court of Appeals denied leave to appeal on May 31, 2017. *People v. Romero*, 29 N.Y.3d 1036 (2017) (SR at 668).

Petitioner raises the following claims for this court's review:

1. The evidence was insufficient to establish petitioner's guilt beyond a reasonable doubt. (Pet. Grd. 1).

Respondent argues for denial of the petition, claiming that petitioner has failed to exhaust his state court remedies, and the claim is thus barred by procedural default. In the alternative, respondent argues that petitioner's claim is without merit. (Dkt. No. 7). Petitioner has filed a Supplemental Memorandum and a Traverse in support of his arguments. (Dkt. Nos. 1-1, 13). For the following reasons, this court agrees with the respondent and finds that the petition may be denied and dismissed.

## DISCUSSION

### I. FACTS

As stated by the Appellate Division in its 2017 decision, this case arose from an

---

[1] The sentencing transcript appears at (Dkt. No. 9-4, CM/ECF pp.189-99). The judge imposed the sentence at pp.197-98.

[2] On March 1, 2017, petitioner was resentenced to 7 years incarceration for the second degree assault conviction. (Pet. ¶ 2(b)).

2

incident in which "three men ambushed two victims on a residential street in the City of Syracuse." *People v. Romero*, 147 A.D.3d at 1491. The victims were two brothers: Andre Rosario-Claudio ("Andre") and Edgardo Torres-Claudio ("Edgardo"). Earlier that day, Andre was involved in an altercation with petitioner's co-defendant, Efrain Santos. The chain of events began when another young man, Gilberto Rodriguez ("Rodriguez"), got into an argument with Santos, who was also known as "Papito," at the front entrance of the two-family home in which they both lived. (Rodriguez: (T2) at 169-70) (Dkt. No. 9-3 at 377-78).[3] Rodriguez was friends with Andre and his brother Edgardo. (*Id.* at 171-72) (Dkt. No. 9-3 at 379-80). Andre came over from across the street and asked why Rodriguez and Santos were arguing. Apparently, due to a miscommunication between Andre and Santos, based on a language barrier, they started a fist fight. (*Id.* at 172) (Dkt. No. 9-3 at 380).

Andre's brother Edgardo testified that he had been sitting on the front porch of his grandmother's house, when he saw the argument between Andre and Santos which was taking place in Pepito's hallway. (Edgardo: (T) at 454-57) (Dkt. No. 9-2 at 457). Edgardo testified that by the time that he went across the street, he saw Santos come out of the house with his "eye . . . all messed up." (*Id.* at 457) (Dkt. No. 9-2 at 460). By the

---

[3] The state court records have been electronically filed in four separate documents (Dkt. Nos. 9-1 - 9-4). Docket Number 9-1 contains the State Court Records, including the parties' briefs, the appellate decision, and various other documents. These records are Bates-stamped and will be cited ("SR"). The trial transcripts, including sentencing are filed in the last three CM/ECF documents. The first four volumes of the transcript are consecutively paginated. However, volumes five through nine restart the page numbering at 1 but are then consecutively paginated. (Dkt. Nos. 9-3 at 203 - 9-4 at 188). The sentencing transcript is also separately paginated and appears at (Dkt. No. 9-4 at 189-99). Respondent's counsel has differentiated between the two consecutively paginated transcripts, referring to Volumes 5-9 of the transcript as (T2). Although for ease of reference the court will follow respondent's counsel's citations, I will also note the CM/ECF docket number and page.

time Edgardo reached Andre, Rodriguez had already broken up the fight. (Rodriguez (T2) at 173) (Dkt. No. 9-3 at 381). Andre sustained only a few minor cuts, but Santos's face was swollen, and he was bruised and bleeding. Andre left after the fight and went to a store nearby. (*Id.*) Santos telephoned his friend, Maximino Alvarez, told him about the fight, and told Alvarez that both Andre and Edgardo were involved. (Alvarez: T. at 656-58) (Dkt. No. 9-3 at 123-25). Alvarez decided to go to Santos's house and find out what was going on. (*Id.* at 659) (Dkt. No. 9-3 at 126). He asked his sister, Leslie Vasquez, to give him a ride in her van. (*Id.*) Their nephew, Francisco Rodriguez, was with them in the van. (*Id.* at 659-60) (Dkt. No. 9-3 at 126-27).

On the way, Alvarez decided to stop and borrow a weapon "for [his] own protection" because he knew that Andre and Edgardo sometimes carried weapons. (*Id.* at 661) (Dkt. No. 9-3 at 128). They stopped at the corner of Elliot and Geddes Streets, where Alvarez asked petitioner if he could borrow a weapon. (*Id.*) Alvarez testified that he knew petitioner, but did not spend time with him. Alvarez asked petitioner to borrow a gun. (*Id.* at 662) (Dkt. No. 9-3 at 129). Petitioner handed Alvarez a dark colored gray pistol. (*Id.* at 662-63) (Dkt. No. 9-3 at 129-30). After petitioner gave Alvarez the gun, he "just decided to jump in the van also." (*Id.* at 663) (Dkt. No. 9-3 at 130). Alvarez testified that at that time, he did not know whether petitioner also had a gun. (*Id.* at 664) (Dkt. No. 9-3 at 131).

Edgardo testified that, while Andre was still at the store, Edgardo saw the van pull up, and Edgardo saw petitioner and Alvarez get out of the van and go into Santos's backyard. (Edgardo: T. 461-62) (Dkt. No. 9-2 at 464-65). Edgardo testified that he

4

knew Alvarez from the neighborhood, but only recognized petitioner because he had seen him a couple of times before. (*Id.* at 460-61) (Dkt. No. 9-2 at 463-64). Edgardo did not know petitioner's name at the time. (*Id.* at 462) (Dkt. No. 9-2 at 465). Alvarez and petitioner met Santos in his backyard, where Alvarez noticed that petitioner also had a gun. Alvarez testified that he began having second thoughts about the situation, so he asked Santos to call Alvarez's sister to come and pick him up. Santos made the call, as he was walking toward his front yard.

Andre returned from the store and stopped by Rodriguez's house to look for a ring that he believed to have lost during the fight. As he and Rodriguez were looking for the ring, Santos brushed by Andre and stated: "If you want some more, come in the back." (Rodriguez: (T2) at 173-74) (Dkt. No. 9-3 at 381-82). Santos walked into the backyard, followed by Andre. Edgardo testified that he was on his front porch when he saw Andre follow Santos into Santos's backyard. Edgardo got up and ran across the street, yelling at Andre that this was "a setup." (Edgardo: T. at 466, 494-95) (Dkt. No. 9-2 at 466, 497-98). Edgardo encountered Alvarez while running toward the backyard on the left side of the house. (*Id.* at 466) (Dkt. No. 9-2 at 469). Edgardo testified that Alvarez was holding a gun to his back. (*Id.* at 466) (Dkt. No. 9-2 at 469). Alvarez told Andre and Edgardo to "just leave the situation alone." (Alvarez: T. 674) (Dkt. No. 9-3 at 141). Andre and Edgardo then turned back and headed to the front yard. (*Id.*) Andre was running, but Edgardo walked slowly because he was worried that Alvarez had the gun pointed at his back. (Edgardo: T. at 466) (Dkt. No. 9-2 at 469). As he stood at the front of the house, Rodriguez saw Andre returning from the backyard. (Rodriguez: (T2)

5

at 175) (Dkt. No. 9-3 at 383). Andre had nearly reached the street when petitioner appeared from the opposite side of the house and began shooting at Andre. (*Id.*) Rodriguez identified petitioner as the individual who was shooting at Andre. (*Id.* at 176-77) (Dkt. No. 9-3 at 384-85). Rodriguez ran away when the shooting started. (*Id.* at 178) (Dkt. No. 9-3 at 386).

Edgardo was still on the left side of the house when he heard the first gunshots. (Edgardo: T. 466) (Dkt. No. 9-2 at 469). Edgardo testified that when he reached the front of the house, he saw petitioner shooting at Andre as he lay on the ground. Edgardo approached Andre to help him. (*Id.*) Alvarez heard the shots and thought that Edgardo and Andre were shooting at him, so he headed toward the front of the house and began firing his gun. (Alvarez: T. at 676) (Dkt. No. 9-3 at 143). Alavarez shot and wounded Edgardo, who fell on the ground next to Andre.[4] (*Id.* at 677-78; Edgardo: T. at 467) (Dkt. No. 9-3 at 144; Dkt. No. 9-2 at 470-71). Edgardo identified Alvarez as the individual who shot him. (Edgardo: T. 471) (Dkt. No. 9-2 at 474). Alvarez did not actually see petitioner shoot Andre. (Alvarez: T. at 675) (Dkt. No. 9-3 at 142). The defendants fled the scene in a van, driven by Alvarez's sister. (*Id.* at 681) (Dkt. No. 9-3 at 148). Edgardo suffered two gunshot wounds to his leg and was hospitalized. (Edgardo: T. at 476) (Dkt. No. 9-2 at 479). Andre suffered four gunshot wounds and died from his injuries. (Dr. Deborah Johnson: T. 620-23, 640) (Dkt. No. 9-3 at 87-90).

Rodriguez admitted at trial giving conflicting accounts of the shooting. When he first spoke to the police, he gave a detailed statement which turned out to be false, and

---

[4] Alvarez testified that once he realized that he shot Edgardo, Alvarez did not wait to see him fall. He just "left." (Alvarez: (T. at 144) (Dkt. No. 9-3 at 677).

he acknowledged this fact to the jury. (Rodriguez: T. at 204-207, 209-12) (Dkt. No. 9-3 at 412-15, 417-20). However, he testified that when he spoke to the police on June 8, 2013, he told them the correct facts to which he testified in court. (*Id.* at 212) (Dkt. No. 9-3 at 420). In fact, Rodriguez appeared in court with his own attorney, who was representing him on an unrelated criminal case in which he stabbed another individual. (T. 189-199) (Dkt. No. 9-3 at 397-407).

The court also notes that Alvarez pled guilty, pursuant to a cooperation agreement to first-degree assault in connection with the instant crime in return for a negotiated sentence of 15 to 20 years incarceration, followed by 5 years of post-release supervision. (Alvarez: (T. 687-89) (Dkt. No. 9-3 at 154-56). This fact was also considered by the jury. (*Id.*) Petitioner's defense counsel cross-examined most of the prosecution's witnesses regarding inconsistencies in their identification of petitioner and in their description of the shooting.[5] All of the information was before the jurors for their consideration. Three of Andre and Edgardo's relatives testified at trial. Respondent's brief outlines their testimony, including the inconsistencies that were brought out on both direct and cross examination. (Resp.'s Br. at 8-10). After hearing all the evidence, the jury convicted both petitioner and Santos on all counts.

---

[5] One such identification issue was based on the fact that within days of the shooting, Edgardo's girlfriend showed Edgardo photographs of an individual who she found on Santos's Facebook page and who Edgardo believed was the individual who shot Andre. (Edgardo: T. at 472-73) (Dkt. No. 9-2 at 475-76). However, it was later determined that the individual whose picture Edgardo identified was conclusively eliminated as a suspect based on a confirmed alibi. (Det. Walsh: T. at 363; Det. Jeffrey Okon (T2) at 249-50) (Dkt. No. 9-2 at 366; Dkt. No. 9-3 at 457-58). Edgardo's girlfriend also showed Edgardo a photo of petitioner, who Edgardo then recognized as Andre's shooter. (Edgardo: T. 473, 475-76; Det. Walsh: T. 365-66) (Dkt. No. 9-2 at 473-76; 368-69). Detective Walsh testified that by the time the police received petitioner's photograph from Edgardo's second identification, the petitioner was already a suspect. (Det. Walsh: T. 365-66) (Dkt. No. 9-2 at 368-69).

## II.   EXHAUSTION/PROCEDURAL DEFAULT

### A.   Legal Standards

#### 1.   Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

#### 2.   Procedural Default

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal

8

claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977). A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural. *Id*.

There are certain situations in which the state law basis for decision will not be considered "adequate": (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); (2) where the state procedural rule was not "'firmly established and regularly followed,'" *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *James v. Kentucky*, 466 U.S. 341, 348-349 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so, *Wainwright v. Sykes*, 433 U.S. at 87. In certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." *Garvey v. Duncan*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. at 376).

In order to find that the application of a generally sound rule is exorbitant, the court considers (1) whether the alleged procedural violation was actually relied upon by the state court and whether perfect compliance with the state rule would have changed the court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner

9

"substantially complied" with the rule given the realities of trial and whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).

In addition, if the court finds that petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims would then be "deemed" exhausted, but would be barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). As stated above, a state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas, supra*. "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

### B.     Application

In this application, petitioner argues that "The evidence did not establish Petitioner's guilt beyond a reasonable doubt as constitutionally required." (Pet. Ground

One). His petition raises a federal constitutional argument. Respondent argues that petitioner has failed to exhaust his state court remedies with respect to his only ground for relief. On direct appeal, petitioner raised only a claim that his conviction was "against the weight of the evidence."

Under New York State law, a "weight-of-the-evidence" claim and a constitutional "legal sufficiency" claim are related, but have distinctly different standards. *See People v. Bleakley*, 69 N.Y.2d 490 (1987). A claim that the verdict is against the "weight-of-the-evidence" is a purely state law claim, based upon N.Y. Crim. Proc. Law § 470.15, whereas a legal sufficiency claim is based upon federal constitutional principles. *See Garbez v. Greiner*, No. 01 Civ. 9865, 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002) (citing *People v. Bleakley*, 69 N.Y.2d 490 (1987)).

The Appellate Division cited *Bleakley*, 69 N.Y.2d at 495, and concluded that "viewing the evidence in light of the elements of the remaining crimes as charged to the jury . . . the verdict is not against the weight of the evidence. . . . 'The jury's resolution of credibility and identification issues is entitled to great weight,' . . . and we decline to disturb the jury's determination of those issues. 147 A.D.3d at 1492 (citations omitted). The court did consider a "legal sufficiency" argument on petitioner's separate claim, which challenged his conviction for first degree assault. The Appellate Division reversed the conviction for first degree assault because there was "insufficient evidence that the surviving victim suffered serious physical injury," an element of first degree assault. *Id.* at 1491. However, the Appellate Division also concluded that the evidence was legally sufficient to convict petitioner of *second degree* assault and sent the case

11

back for resentencing on that particular count. *Id.* at 1491-92.

As respondent notes, petitioner made different arguments based on legal sufficiency of his assault conviction than he made for his "weight" of the evidence argument, which addressed the remaining convictions. *Compare* SR 19-35 (weight-of-the-evidence argument focusing on credibility of witnesses) *with* 49-54 (specifically arguing legal sufficiency of first degree assault conviction). The People responded by addressing the weight-of-the-evidence in petitioner's first appellate argument as distinguished from the sufficiency of the evidence which was his fifth claim. (SR 72-78 (weight), 89-90 (legal sufficiency)). Thus, neither petitioner, nor the People alerted the state court to a federal constitutional claim, other than that which was addressed to the first degree assault conviction, a conviction which petitioner does not challenge in this court.

To the extent that petitioner now seeks to bring a legal sufficiency claim, with respect to his weight of the evidence argument, the claim is not exhausted. A "legally sufficient verdict can be against the weight of the evidence." *People v. Davidson*, 9 N.Y.3d 342, 349 (2007) (citing *People v. Cahill*, 2 N.Y.3d 14, 62 (2003)). Thus, bringing a "weight-of-the-evidence" claim in New York State Court does not necessarily raise the legal sufficiency claim, even though the weight of the evidence claim must be determined "in light of the elements of the crime as charged." *Id.* at 348-49. However, in a weight-of-the-evidence claim, the court sits "as the thirteenth juror and decides which facts were proven at trial." *Id.* (citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)). Legal sufficiency does not test credibility of the witnesses at trial. *See*

*Cavazos v. Smith*, 565 U.S. 1, 6-7 (2011) (trier of fact resolves conflicts in the evidence, and the court must defer to that resolution); *United States v. Elder*, No. 17-CR-4376796, at *3 (W.D.N.Y. Sept. 14, 2018) (in reviewing the legal sufficiency of the evidence, the court gives deference to the jury's assessment of the witnesses' credibility and the jury's resolution of conflicting evidence) (citations omitted)).

The court notes that in *Tibbs*, the Supreme Court held that a reversal based on the "weight" of the evidence does not preclude a retrial, unlike a reversal based on insufficient evidence, highlighting the difference between the two analyses. 457 U.S. at 42. It has subsequently been held in the exhaustion context, that a "weight-of-the-evidence" claim may not "stand in" for a legal sufficiency claim. *Hughes v. Sheahan*, 312 F. Supp. 3d 306, 343 (N.Y.N.D. 2018) (citing *Pham v. Kirkpatrick*, 209 F. Supp. 3d 497, 512 (N.D.N.Y. 2016), *aff'd* 711 F. App'x 67 (2d Cir. 2018); *Shuler v. Artus*, No. 9:15-CV-399, 2016 WL 698106, at *4 (N.D.N.Y. Feb. 19, 2016) (collecting cases).

In *Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012), the Second Circuit outlined the differences between weight-of-the-evidence claims and legal sufficiency claims, stating that the New York standard "requires more exacting review than an insufficiency claim, because it entails a weighing of the evidence and an assessment of the credibility of the state's witnesses."[6] The court in *Schuler* further stated that "[i]n

---

[6] Although the court notes that in *Parker*, the court commented that "to the extent the Appellate Division decided that Parker's conviction was not against the weight-of-the-evidence, it necessarily decided that there was sufficient evidence to support the verdict." 666 F.3d at 833. However, the court also found that there was no question that Parker "failed to preserve" his insufficiency claim, even though he raised, and the state court decided the merits of, a weight-of-the-evidence claim. *Id.* at 834. Parker raised both his legal sufficiency and his weight-of-the-evidence claim in the Appellate Division, unlike the petitioner in this case, and the Appellate Division specifically found that petitioner's counsel had failed to preserve a sufficiency of the evidence claim, rendering it procedurally defaulted. *Id.*

13

fact, '[t]he difference in standards is more than semantic; it can be outcome-dispositive.'" *Shuler*, 2016 WL 698106 at *4 (quoting *Lopez v. Sup't Five Points Corr. Fac.*, No. 1:14-CV-4615, 2015 WL 1300030 at *12 (S.D.N.Y. Mar. 23, 2015)).

Thus, petitioner's only ground for relief is unexhausted. To the extent that the sufficiency claim is "unexhausted," the petitioner would have no avenue in state court to exhaust the claim. Petitioner raised the weight-of-the-evidence claim on appeal, and if he attempts to bring a motion to vacate his conviction in the trial court, the court would either deny the claim because the Appellate Division has already decided the issue or, more likely, to the extent that he brings a legal sufficiency claim that is different than the weight of the evidence claim, would deny the federal constitutional claim because petitioner unjustifiably failed to raise the issue on appeal – a procedural default under New York Law. See N.Y. Crim. Proc. Law § 440.10 (2)(c).

In his reply, petitioner now argues that if the court should find that he procedurally defaulted on his habeas claim, a failure to review the merits of his claim would result in a "fundamental miscarriage of justice." (Dkt. No. 13 at 5). However, petitioner then appears to argue that his appellate attorney was "difficult to work with" and that he made it clear to her that he was "100% innocent [and] that the witnesses . . . falsified their eyewitness accounts [and] that 'the evidence should be considered legally insufficient.'" (*Id.*) Petitioner emphasizes that he spoke little English and had "no grasp

---

Although the Second Circuit ultimately considered the sufficiency of the evidence, it did so only in conjunction with the procedural default analysis because petitioner claimed that his failure to preserve was due to ineffective counsel. *Id.* Therefore, the Second Circuit was required to determine whether ineffective assistance of counsel was the "cause" for petitioner's procedural default, a question which the Second Circuit decided in the negative. *Id.* at 834-35.

of New York criminal law and procedure," and as a result had to rely on counsel. At the same time, petitioner argues that *he* "emphatically and persistently - requested she raise a legal sufficiency claim on his direct appeal," but that counsel "inexplicably raised a mixed claim of weight of the evidence [and] sufficiency of the evidence claim." (*Id.*)

Petitioner then states that the Appellate Division "did not even address the claim," and that "there is no record that the Appellate Court even considered the elements of the crime beyond a reasonable doubt, whether the prosecution witnesses were credible, and if the state proved its case beyond a reasonable doubt."[7] (*Id.* at 5-6). Finally petitioner argues that "whether it is a weight of the evidence review or a legal sufficiency review, the witnesses were not credible and did not provide sufficient evidence to support the jury verdict." (*Id.* at 6). Petitioner is incorrect on most of his arguments.

First, to the extent that he is attempting to assert ineffective assistance of counsel on appeal as "cause" for his procedural default, he cannot succeed. Ineffective assistance of counsel may suffice to show cause to excuse a procedural default. *Hawkins v. Graham*, No. 1:12-CV-643, 2014 WL 317842 at *6 (W.D.N.Y. Jan. 29,

---

[7] To the extent that petitioner claims that the Appellate Division "did not even address the claim, he is correct that the Appellate Division did not address the "legal sufficiency" claim because petitioner did not raise a legal sufficiency claim with respect to his first ground for relief, and that is the reason why his claim is unexhausted. To the extent that petitioner argues that the Appellate Division did not consider his weight-of-the-evidence claim, he is incorrect. As stated above, the Appellate Division specifically decided the weight-of-the-evidence claim on the merits as it related to New York law. 147 A.D.3d at 1492. The court "decline[d] to disturb the jury's resolution of [credibility and identification] issues." *Id.*

15

2014) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)).  However, petitioner would have to separately exhaust an ineffective assistance of counsel claim in state court in order to allege that his appellate attorney's failure to raise the issue on appeal was "cause" for his procedural default. *See id.* (a claim of ineffective assistance of counsel must generally be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default).

There is no question that petitioner has failed to bring a claim of ineffective assistance of appellate counsel in New York State court.  Such a claim would have to be brought by way of an application for a writ of error coram nobis in the Appellate Division, and any denial of the application would have to be appealed to the New York Court of Appeals. *Rodriguez v. Uhler*, No. 15-CV-9297, 2017 WL 9807068, at *6 (S.D.N.Y. Oct. 23, 2017) (citing inter alia N.Y. Crim. Proc. Law §§ 450.90(1), 460.10(5)(a)).  Thus, petitioner may not assert ineffective assistance of appellate counsel as "cause" for his procedural default.[8]  If petitioner has not established "cause," then the court need not consider whether petitioner suffered actual prejudice because both elements must be established. *Murray v. Carrier*, 477 U.S. at 496.

Petitioner then argues that if the court declines to address the procedurally defaulted claim, there will be a fundamental miscarriage of justice.  Essentially, petitioner makes the argument that the witnesses were "incredible," and therefore

---

[8] Petitioner also forgets that appellate counsel obtained the reversal of one of his convictions based on her claim that the evidence was "legally" insufficient to sustain the conviction, and petitioner was resentenced on the reduced charge.

16

failing to consider the merits of his claim will result in a miscarriage of justice. He asserts that he speaks little English, and that he has always maintained his innocence of all the charges. (Dkt. No. 13 at 5).

The miscarriage of justice exception to consideration of a procedurally defaulted claim deals with "actual" as opposed to "legal" innocence. *Schuler v. Artus*, 2016 WL 698106 at *6 (quoting *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)). A claim of "actual innocence," must be based on "'new reliable evidence' not presented at trial, and demonstrate that in light of the new evidence, 'it is more likely than not that no reasonable juror would have found the petitioner guilty.'" *Whitfield v. Graham*, No. 10-CV-3038, 2016 WL 11270092, at *3 (S.D.N.Y. Sept. 2, 2016), (*Rep't Rec.*), *adopted*, 2017 WL 4060571 (S.D.N.Y. Sept. 13, 2017) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)), *reconsideration denied*, 2018 WL 1662782 (S.D.N.Y. Feb. 7, 2018).[9] The court then assesses "'how reasonable jurors would react to the overall, newly supplemented record.'"[10] *Id.* (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).

In this case, petitioner has not come forward with any new evidence that was not presented at trial. Although he claims that all six witnesses who identified him lied, he argues only that, based on the evidence presented at trial, they were inherently

---

[9] The Second Circuit denied a certificate of appealability. *Whitfield v. Graham*, No. 17-3096, 2018 WL 4772424 (2d Cir. Mar. 14, 2018).

[10] Although actual innocence claims may serve as a "'gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits,'" the Supreme Court has not resolved whether such a claim may be an independent ground for habeas relief, and the Second Circuit has declined to recognize a free-standing actual innocence claim as a federal constitutional right to be released from prison. *Whitfield*, 2016 WL 11270092 at *3 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *House v. Bell*, 547 U.S. 518, 555 (2006); *United States v. Quinones*, 313 F.3d 49, 67 (2d Cir. 2002)).

17

incredible. Petitioner states that the "lack of cross-corroboration" was not based on "minor contradictions" that were "immaterial," but was based on "implausible and even physically impossible accounts of material events." (Dkt. No. 13 at 6). Although the petitioner claims that the witnesses were lying, there is no new evidence that supports petitioner's allegations. The gateway actual innocence standard is not the same as the *Jackson v. Virginia* standard for insufficient evidence because the "actual innocence" standard requires evidence that was not before the jury. *House v. Bell*, 547 U.S. at 538; *Brewer v. Lee*, No. 16-CV-4051, 2019 WL 1384074, at *3 (E.D.N.Y. Mar. 26, 2019) (citations omitted).

    All the bases for rejecting the credibility of the witnesses' testimony were brought out on cross-examination. The jury was aware of all the alleged inconsistencies in the evidence and the testimony, in addition to the original failure of any of the witnesses to identify the petitioner. The jury was also made aware of the witnesses' interests in testifying and whether they had been given a "benefit" in exchange for their testimony. The jury was clearly aware of the relationship between several of the witnesses and the deceased. These facts all went to the weight that the jury was entitled to give the witnesses' testimony. It is not this court's province to retry the case or to redetermine the credibility of the witnesses or determine the weight that the jury should have given to the witnesses's statements based on the petitioner's claims. Because petitioner has failed to come forward with any "new" evidence that was not presented at trial, he cannot establish that the failure to address his claim will result in a fundamental miscarriage of justice, and his claim remains subject to

dismissal for procedural default.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

**RECOMMENDED**, that a certificate of appealability be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: April 18, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge